**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **CAMERON RASHUN BYRD,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 5:13-cv-08054-KOB** |
| | ) | **5:11-cr-404-KOB-PWG** |
| | ) | |
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Respondent.** | ) | |

**MEMORANDUM OPINION**

On January 20, 2012, after a four-day trial, a jury convicted Cameron Rashun Byrd of

carjacking in violation of 18 U.S.C. § 2219 and two counts of brandishing a firearm in violation

of 18 U.S.C. § 924(c). The court sentenced Mr. Byrd to 399 months in custody. Mr. Byrd filed

this motion to vacate, set aside or correct his sentence. (Civ. Doc. 1).[1] A prisoner "claiming the

right to be released upon the ground that the sentence was imposed in violation of the

Constitution or laws of the United States . . . may move the court . . . to vacate, set aside or

correct the sentence." 28 U.S.C. § 2255. Mr. Byrd's motion focuses on allegations that his

retained trial counsel provided ineffective assistance.

I.      **BACKGROUND**

A.      **Indictment and Initial Plea Negotiations**

On May 11, 2011, a carjacking occurred at a liquor store in Huntsville, Alabama. Shortly

after the carjacking, a nearby convenience store was robbed. A federal grand jury indicted Mr.

Byrd and Thomas Flowers, Kevin Holmes, and Ernest Starks, for carjacking in violation of 18

---

[1]Documents from Mr. Byrd's criminal trial, case number 5:11-cr-404, are designated "Cr. Doc. __."

U.S.C § 2219 and two counts of brandishing a firearm in violation of 18 U.S.C § 924(c).

At the time, Mr. Byrd was a freshman at Alabama A&M University. He had never been arrested and had no prior experience with the legal system. Mr. Byrd retained Frederic L. Washington to represent him, based on the recommendation of a family member. Mr. Byrd agreed to pay Mr. Washington $2,500 plus expenses. Mr. Washington had represented criminal defendants in federal court before, including three charged with violating § 924(c). But Mr. Washington had never represented a defendant charged with multiple violations of § 924(c).

Unknown to Mr. Byrd or his family, Mr. Washington was employed with the Legal Aid Society of Birmingham when he undertook representing Mr. Byrd. Mr. Washington's contract with the Legal Aid Society prohibited him from performing legal services for compensation outside his duties to Legal Aid. Mr. Byrd and his family did not learn of Mr. Washington's employment with the Legal Aid until after the court sentenced Mr. Byrd; and after Legal Aid learned of his representation of Mr. Byrd, it terminated Mr. Washington's employment.

In November 2011, Mr. Washington and Mr. Byrd traveled from Birmingham to Huntsville to meet with federal law enforcement officials about the federal charges against Mr. Byrd. Assistant United States Attorney Terrence O'Rourke and FBI Special Agent Jonathan Sumner told Mr. Byrd that the government would recommend a five-to-seven year sentence if he cooperated and testified against the other people involved.

On November 22, 2011, Magistrate Judge Robert Armstrong arraigned Mr. Byrd. At the hearing, Mr. Washington waived reading of the indictment. (Cr. Doc. 12). Mr. Byrd alleges that Mr. Washington never provided him with a copy of the indictment against him. (Doc. 15-1 at 3).

After the arraignment, Mr. Washington visited Mr. Byrd at the Cullman County Detention Facility. (Doc. 1 at 32–33). Mr. Washington brought a copy of a proposed plea

agreement. Under the agreement, the government would dismiss one of the § 924(c) charges and recommend a low-end guideline sentence in exchange for Mr. Byrd pleading guilty to the remaining counts. (Doc. 1 at 35–51).

The parties dispute whether the agreement required Mr. Byrd's cooperation. The plea submitted by Mr. Byrd does not state that cooperation was a condition and he contends it was not. (Doc. 1 at 35–51). And at a phone conference with the court on the eve of trial, the government stated that it did not expect Mr. Byrd's cooperation, "whether he pleads or not." (Cr. Doc. 87 at 18). However, Mr. Washington, in an affidavit submitted by the government, states that Mr. Byrd's cooperation was a prerequisite for the plea agreement. (Doc. 9 at 24; Doc. 9-1 at 1). Mr. Byrd claims Mr. Washington never provided him with a copy of the agreement, as he only brought one copy to the meeting. (Doc. 15-1 at 6). On the basis of this evidence, the government asserts that cooperation was a prerequisite of the plea agreement.

Mr. Byrd and Mr. Washington also have conflicting accounts of the advice offered concerning the plea agreement. Mr. Byrd claims that Mr. Washington erroneously informed him he faced, at most, ten years in prison by proceeding to trial, and that he had a good probability of prevailing at trial. Mr. Byrd also claims Mr. Washington failed to explain to him he was facing charges that carried mandatory minimums or that co-participants Kevin Holmes and Thomas Omar Flowers had agreed to testify against him. Mr. Byrd claims Mr. Washington called the government's offer weak. In rejecting the plea agreement, Mr. Byrd claims he was motivated by Mr. Washington's faulty counsel. If he knew the strength of the evidence against him and the lengthy mandatory prison term he faced, Mr. Byrd claims he would have accepted the government's offer. (Doc. 15-1 at 4–7).

Mr. Washington says that Mr. Byrd never expressed a desire to enter a plea and testify for

the government, and that is the reason Mr. Byrd rejected the government's offer for that reason.

Mr. Washington claims he advised Mr. Byrd on multiple occasions he faced "30 to 35 years" in

prison if found guilty, but Mr. Byrd said he wanted to proceed to trial, despite Mr. Washington's

warning of the risk of doing so. Mr. Washington also claims Mr. Byrd knew that Mr. Flowers

and Mr. Holmes would testify for the government. (Doc. 9-1 at 1–2).

Sonja Williams, Mr. Byrd's mother, says that she met with Mr. Washington in November

2011 to discuss Mr. Byrd's case. At that meeting, Ms. Williams says that Mr. Washington told

her that Mr. Byrd faced a maximum of ten years imprisonment if he were convicted. Ms.

Williams also says Mr. Washington told her he believed Mr. Byrd had a good shot of prevailing

at trial. (Doc. 15-1 at 11–12).

**B.     Trial**

On January 17, 2012, the case proceeded to trial. Thomas Flowers and Kevin Holmes

accepted plea agreements in exchange for testifying against Mr. Byrd and Ernest Starks, the two

defendants proceeding to trial.

 Before the trial began, the government placed a colloquy about the rejected plea

agreement on the record:

> THE COURT: It's my understanding that before we bring the jury
> in, there's one matter that the government would like to put on the
> record. Is that correct, Mr. O'Rourke?
>
> MR. O'ROURKE: Yes, Your Honor.
>
> THE COURT: You may proceed.
>
> MR. O'ROURKE: Your Honor, the government wants to put on
> the record that in terms of defendant Cameron Rashun Byrd, he is
> charged with two separate counts of 924(c). If convicted, the first
> count would carry a mandatory minimum seven years. Second, to
> the mandatory minimum, twenty-five years, to be served on

consecutively for a total of thirty-two years. The government did offer Mr. Byrd a plea in which the government agreed to drop one of the 924(c) [sic] if he had pled. The government wants to make a record that we did make that offer.

THE COURT: All right. Mr. Byrd, I wanted the record to reflect that offer was made to you and you did in fact reject it; is that correct?

DEFENDANT BYRD: Yes, ma'am.

THE COURT: Okay. And that was your decision?

DEFENDANT BYRD: Yes, ma'am.

THE COURT: All right. Let's bring the jury in.

(Cr. Doc. 82 at 3–4).

When Mr. Byrd heard this exchange, he says he was confused because he had never been told by Mr. Washington he was facing such significant prison time. Before the colloquy, Mr. Byrd claims Mr. Washington told him that the court wanted to put something on the record but not to worry about it and just say "yes ma'am." (Doc. 15-1 at 6).

At the start of the trial, Mr. Washington gave an opening statement and asked the jury to do two things. First, he asked the jury to keep in mind the question of "what would I do to keep myself out of trouble or out of jail?" and he reminded the jury that the government's cooperating witnesses had an incentive not to be entirely truthful. Second, Mr. Washington asked the jury to make the prosecutor "prove each and every word that he says." (Cr. Doc. 82 at 154–55).

The victim of the carjacking was the first witnesses to testify. Mr. Washington cross-examined the witness about what he did and did not see during the incident. Mr. Washington solicited testimony from the witness that he could not identify the person who had brandished the firearm at him. (Cr. Doc. 82 at 178–84).

Next, the victim of the convenience store robbery testified. Mr. Washington cross-examined this witness. As with the carjacking victim, Mr. Washington established that the witness could not identify the perpetrators. (Cr. Doc. 83 at 211–13).

The government then called Mr. Holmes, one of the government's two cooperating witnesses. Mr. Washington cross-examined Mr. Holmes about inconsistencies between his testimony and its tension with previous statements he made to police. (Cr. Doc. 83 at 310–334).

Mr. Washington also cross-examined Omar Flowers, the other cooperating witness. Mr. Washington brought out that Mr. Flowers had accepted a plea bargain from the government. Mr. Washington also objected to the government's request for physical demonstrations and comparison of the height of Mr. Byrd and Mr. Flowers, as video showed the taller of two perpetrators brandished a firearm, and countered the demonstration with a comparison of the heights of Mr. Holmes and Mr. Flowers to Mr. Byrd. The government was trying to show that Mr. Byrd was taller than the other men, as testimony and evidence had established that the taller perpetrator was the one carrying a firearm. (Cr. Doc. 83 at 375–77, 408–21, 447–48).

During Mr. Byrd's defense, Mr. Washington called Investigator David Williams with the Huntsville Police Department. Investigator Williams briefly testified about a report and supplement on the case. (Cr. Doc. 83 at 507–14).

Mr. Washington made a closing argument. Mr. Washington observed that the carjacking and robbery victims could not identify the perpetrators and noted the inconsistencies in both Mr. Holmes and Mr. Flowers' testimony. Mr. Washington returned to his opening theme: "What would I do to keep myself out of trouble?" and asked the jury to consider the credibility of the government's two cooperating witnesses. (Cr. Doc. 84 at 600–08).

After deliberating, the jury returned a verdict of guilty on all counts against Mr. Byrd.

(Cr. Doc. 49).

### C.    Sentencing

Mr. Washington did not file a sentencing memorandum or objections to the Pre-Sentence Report. After Mr. Byrd received the Pre-Sentence Report stating that he was facing 25 years to life imprisonment as a result of the second § 924(c) conviction, he wrote a letter to his girlfriend:

> [Mr. Washington] aint tell me how serious dis shit was he aint neva tell me dat I should've sign that damn plea deal. Hell it's his fault he a fake ass lawyer. And that mothafucker advised me not to take it because he was like I can go to trial and get 10 years. Hell yea boo I would have taken dat damn plea & took da mothafucking stand.

(Doc. 1 at 54).

After the trial, on April 23, 2012, Ms. Williams, Mr. Byrd's mother; Lillie Garth, Ms. Williams' sister; and Pastor Tommie Lewis of Bethel Baptist Church met with Mr. Washington to discuss Mr. Byrd's case. At the meeting, Pastor Lewis asked Mr. Washington how much time Mr. Byrd was facing for his convictions. According to Ms. Williams, Ms. Garth, and Pastor Lewis, Mr. Washington responded that he faced seven to ten years. (Doc. 15-1 at 13–14, 18–19, 22–23).

Mr. Washington then pulled out the Pre-Sentence Report. Ms. Williams reviewed it and was perplexed because the report stated that Mr. Byrd faced a mandatory minimum of seven years for the first firearms charge and 25 years for the second, to run consecutively. Mr. Washington said the government had made a mistake in the initial report and had to go back and add the mandatory minimums. Mr. Washington said Mr. Byrd's only option was to file an appeal after sentencing.  (Doc. 15-1 at 13–14, 18–19, 22–23).

The court sentenced Mr. Byrd on May 29, 2012. The court sentenced Mr. Byrd to 15

months in custody for the carjacking offense, 84 months for the first firearms offense, and 300 months for the second firearms offense, for a total custodial sentence of 399 months. As the court noted, the bulk of the sentence came "from congress, not from the court," by way of the mandatory minimum sentences for the gun charges. (Cr. Doc. 92 at 8).

At the sentencing hearing, the court encouraged Mr. Byrd to provide any assistance he could to the government. The court informed Mr. Byrd about the possibility of having his sentence reduced through a motion under Fed. R. Crim. P. 35. (Cr. Doc. 92 at 11–12).

After the trial but before sentencing, in an email from Mr. Washington to Attorney Bill Dawson, a family friend of Mr. Byrd who had taken an interest in the case, Mr. Washington said he had discussed the possibility of Mr. Byrd cooperating with the government with Mr. Byrd's mother, but had not heard back from her. Mr. Washington did not say he had discussed it with Mr. Byrd. (Doc. 1 at 56).

On June 25, 2012, Mr. Washington moved to withdraw from representing Mr. Byrd. (Cr. Doc. 81). The court granted the motion, and Federal Public Defenders Kevin Butler and Allison Case took over Mr. Byrd's representation. (Cr. Doc. 89).

After obtaining new counsel, Mr. Byrd sought a reduction of his sentence under Fed. R. Crim. P. 35 for information he provided to the government. However, the government determined that Mr. Byrd was not entitled to a reduction, and the court did not compel the government to move to reduce Mr. Byrd's sentence. (Cr. Doc. 98).

### D. Appeal

Mr. Washington did not file a notice of appeal on Mr. Byrd's behalf. Instead, Attorney Bill Dawson, worried about Mr. Byrd's potential waiver of his appellate rights, helped Mr. Byrd file a pro se notice of appeal. The Eleventh Circuit Court of Appeals affirmed Mr. Byrd's

conviction and sentence, but said it "share[d] the district court's concern that Byrd's sentence, due to the mandatory minimums he faced, seems 'out of proportion to this particular crime in this particular situation and for this particular defendant,' a first-time offender who made a grave mistake falling in with the wrong crowd but who was repentant and otherwise a promising student." *United States v. Starks*, 536 F. App'x 843, 849 (11th Cir. 2013).

Mr. Byrd then filed this habeas action attacking his sentence.

## II.    DISCUSSION

Mr. Byrd attacks his sentence on two grounds: ineffective assistance of counsel at trial and that, after *Johnson*, the residual clause in § 924(c) is void-for-vagueness.

### A.    Ineffective Assistance of Counsel

Mr. Byrd argues that his trial counsel's performance was so deficient it amounted to a violation of his constitutional rights. To support this argument, Mr. Byrd advances three theories: (1) Mr. Washington operated under a conflict of interest while representing Mr. Byrd; (2) Mr. Washington offered him deficient advice during plea negotiations; and (3) Mr. Washington failed to subject the government's case to meaningful adversarial testing.

The Sixth Amendment gives criminal defendants the right to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 684 (1984). Generally, to prevail on a claim of ineffective assistance of counsel, Mr. Byrd must demonstrate that (1) his counsel's performance fell below an objective standard of reasonableness; *and* (2) he suffered prejudice because of that deficient performance. *See id.* at 684–91.

Deficient performance exists when counsel acts "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. The test is not what the best—*or even a good*—lawyer would have done, but "whether *some reasonable lawyer* at the trial could have

acted, in the circumstances, as defense counsel acted at trial." *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc) (emphasis added).

The court presumes petitioner's counsel acted reasonably. *Strickland*, 466 U.S. at 690; *Williams v. Head*, 185 F.3d 1223, 1228 (11th Cir. 1999) ("[W]here the record is incomplete or unclear about [counsel]'s actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment."). To overcome that presumption, a petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Conclusory or unsupported allegations cannot support an ineffective assistance of counsel claim. *See Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (finding "unsupported allegations, conclusory in nature and lacking factual substantiation" to be an insufficient basis for relief); *see also Chandler v. United States*, 218 F.3d 1305, 1314 n.15 ("An ambiguous or silent record is not sufficient to disprove the strong and continuing [*Strickland*] presumption.").

Prejudice arises if "a reasonable probability [exists] that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S at 694. Merely showing that counsel's error had "some conceivable effect on the outcome of the proceeding" cannot establish prejudice. *Id.* at 693.

1.      *Conflict of Interest*

First, Mr. Byrd argues that Mr. Washington's performance was constitutionally deficient because he had an actual conflict of interest between his job with the Legal Aid Society of Birmingham and representing Mr. Byrd. Because Mr. Washington allegedly accepted more work than he could handle, Mr. Byrd argues that Mr. Washington had a conflict of interest between representing Mr. Byrd and his full-time job. Such a conflict, Mr. Byrd argues, should not be held

to the *Strickland* standard requiring prejudice but, rather, that prejudice should be presumed.

Criminal defense counsel "owes the client a duty of loyalty" and a "duty to avoid conflicts of interest." *Strickland*, 466 U.S. at 688. "Inherently prejudicial conflicts of interests," unlike other challenges to counsel's proficiency, do not require a showing of prejudice. *Id* at 682. Instead, to establish a constitutional violation, a criminal defendant "must establish that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980). Once an actual conflict and adverse effect on representation have been established, "a defendant need not show prejudice in order to obtain reversal of his conviction." *Burden v. Zant*, 24 F.3d 1298, 1304 (11th Cir. 1994).

A *possible* conflict—"a speculative or merely hypothetical conflict"—cannot support a Sixth Amendment Violation. *Burden*, 24. F.3d at 1305. Rather, counsel must have an *actual* conflict with the petitioner's representation. An "actual conflict" is a situation where "counsel's introduction of probative evidence or plausible arguments that would significantly benefit one defendant would damage the defense of another defendant whom the same counsel is representing." *Burden*, 24. F.3d at 1305 n.13 (quoting *Baty v. Balkcom*, 661 F.2d 391, 395 (5th Cir. 1981) (Unit B), cert. denied, 456 U.S. 1011 (1982)).

Mr. Byrd asks this court to find that Mr. Washington operated under an actual conflict by moonlighting his representation of him while being employed by the Legal Aid Society. However, Mr. Byrd has provided no authority, and the court has uncovered none, supporting the proposition a defendant whose attorney has accepted more work than can be handled has been per se deprived of effective assistance.

Such an expansion of the presumed prejudice rule cuts against the reasoning of both the Supreme Court and the Eleventh Circuit. The Supreme Court has cautioned against "expansive

application" of presumed prejudice, noting the unique conflicts that arise during multiple concurrent representation and the difficulty of proving prejudice. *Mickens v. Taylor*, 535 U.S. 162, 175 (2002). Further, the Eleventh Circuit has noted "there is no Supreme Court decision holding that any kind of presumed prejudice rule applies outside the multiple representation context." *Schwab v. Crosby*, 451 F.3d 1308, 1327 (11th Cir. 2006).

Mr. Byrd's argument is premised on converting the requirements of professional responsibility to a constitutional standard. *See* (Doc. 15 at 3) (arguing that Mr. Washington's performance violated Rule 1.7 of the Alabama Rules of Professional Conduct). But the purpose of the presumed prejudice exceptions to *Strickland* "is not to enforce the Canons of Legal Ethics, but to apply needed prophylaxis in situations where *Strickland* itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel." *Mickens*, 535 U.S. at 176. Absent explicit guidance from either the Supreme Court or the Eleventh Circuit, the court declines to swim against the current of those Courts' reasoning and hold that a "moonlighting" attorney is conflicted in such a manner that prejudice ought to be presumed.

Given that prejudice cannot be presumed, Mr. Byrd must meet the *Strickland* standard and show prejudice. In an effort to establish prejudice stemming from Mr. Washington's perceived conflict, Mr. Byrd provides a list of Mr. Washington's deficient actions and their effects. The court notes that, at this point, Mr. Byrd is not truly presenting a conflict of interest argument, but instead a traditional *Strickland* claim. To grant relief, the court must find that Mr. Washington's conduct was deficient and that it prejudiced Mr. Byrd. Whether the conduct was caused by a conflict of interest or simple negligence is irrelevant. Its reasonableness rather than its motivation is the germane consideration.

Mr. Byrd argues that Mr. Washington's performance was deficient because he failed to

provide him with copies of court documents, including the indictment against him. To the extent this argument relates to plea advice, it will be addressed in the next section. But, standing alone and outside the plea context, Mr. Byrd has not established *prejudice* from this conduct.

Mr. Byrd also faults Mr. Washington for failing to conduct an independent investigation, arguing that it would reveal that Mr. Washington should have urged Mr. Byrd to accept the plea bargain because the evidence against him was overwhelming. Mr. Byrd's generic allegation that Mr. Washington should have undertaken an "independent investigation" lacks sufficient specificity to support a claim for objectively unreasonable performance. *See Tejada*, 941 F.2d at 1559. Again, to the extent Mr. Byrd's argument here relates to advice communicated to him about his plea agreement, the court will address it in the next section.

Mr. Byrd also points to Mr. Washington's failure to file pre-trial motions, voir dire questions, jury instructions, or a sentencing memorandum as evidence of deficient performance. Mr. Byrd does not explain what arguments Mr. Washington should have advanced in those filings. Instead, Mr. Byrd argues that the "failure to try is unforgivable" and establishes prejudices. But *Strickland* requires more; it requires a showing that a reasonable lawyer would have tried *and* that failing to try resulted in prejudice to the defendant. *See Strickland*, 466 U.S. at 684–691. Mr. Byrd has failed to show that Mr. Washington's performance in this respect was deficient or prejudicial. To the extent Mr. Byrd's argument here claims that Mr. Washington failed to subject the government's case to meaningful adversarial testing, the court will address it in a subsequent section.

Finally, Mr. Byrd argues that Mr. Washington was deficient in failing to seek a motion for the court to depart downward in his sentence. However, Mr. Byrd cannot establish that Mr. Washington's failure prejudiced him, even if the court presumes it was deficient. When Mr. Byrd

obtained new counsel, his new attorneys sought such a motion, the government determined that he was not entitled to a reduction, and the court did not alter that determination. Therefore, even had Mr. Washington sought a downward departure, the record reflects that it would not have been granted.

Mr. Byrd has failed to show that he is entitled to relief under either the presumed prejudice or the *Strickland* standard for Mr. Washington's alleged conflict of interest. Therefore, the court finds this ground to lack merit.

2.      *Unreasonable Advice Regarding Plea Deal*

Mr. Byrd claims that Mr. Washington's assistance during the plea negotiation process was deficient and prejudicial under *Strickland*. Counsel for a criminal defendant "has a duty to advise a defendant, who is considering a guilty plea, of the available options and possible sentencing consequences." *Etheridge v. United States*, 287 F. App'x 806, 808 (11th Cir. 2008).

When a defendant rejects a plea offer, to establish prejudice, he must show (1) a reasonable probability that the plea offer would have been accepted but for counsel's deficient performance; (2) the plea would have been entered without the prosecution rescinding the offer or the court rejecting it; and (3) the plea would have resulted in a lesser charge or a lower sentence. *Missouri v. Frye*, 566 U.S. 133, 147 (2012).

The government concedes that had Mr. Byrd accepted the offered plea, it would have resulted in a lower sentence. Instead, the government challenges Mr. Byrd's claim he relied on his counsel's advice that he was facing a sentence of between seven to ten years in rejecting the government's plea offer. The government argues that the colloquy before the start of trial refutes Mr. Byrd's claim he did not understand the severity of sentence he could face by proceeding to trial.

The colloquy establishes that Mr. Byrd rejected the government's plea offer, but it does not establish that he received effective assistance of counsel or fully understood the terms of the offer and made an informed decision to reject it so that he would not have been prejudiced by his counsel's deficient performance. The colloquy did not inquire into whether Mr. Byrd had discussed the deal with Mr. Washington, whether Mr. Byrd had questions about the deal Mr. Washington could not answer, or whether Mr. Byrd had even reviewed the proposed plea. The court is not persuaded that the colloquy establishes that Mr. Byrd would have rejected the plea agreement *even had* Mr. Washington provided adequate assistance merely because the colloquy stated the correct sentence Mr. Byrd was facing. The colloquy in this case simply will not support the weight the government places on it.

The colloquy cannot be viewed in isolation, but must be considered with Mr. Byrd's other allegations about Mr. Washington's performance. Mr. Byrd alleges that Mr. Washington never provided a copy of the indictment to him and that he was confused by the colloquy's discussion of mandatory minimums, as he had not been previously aware he was facing them. When Mr. Byrd inquired about mandatory minimums, he alleges Mr. Washington blew him off. Mr. Byrd also alleges that Mr. Washington stated he believed they would win at trial, and that Mr. Washington told him to just say "yes, ma'am" to the court's questions. A competent lawyer would not tell his client to simply say "yes" without an explanation of what that answer entails. And given Mr. Byrd's inexperience with the legal system, such advice could be prejudicial as it would prevent Mr. Byrd from fully understanding his situation and the consequences of rejecting the government's proposed plea.

Besides his affidavit, Mr. Byrd has submitted other evidence that Mr. Washington incorrectly advised him about the length of the sentence he faced. After Mr. Byrd received the

Pre-Sentence Report, he wrote a letter to his girlfriend saying that Mr. Washington had not told him how serious the charges against him were, and if he had, he would have taken the plea and taken the stand. This letter is significant for two reasons. First, it provides evidence that Mr. Washington had improperly explained the plea agreement by dramatically underestimating the severity of the potential sentence. The letter also shows that Mr. Byrd believed that the agreement was conditioned on cooperation, despite the absence of cooperation being an element of the written plea agreement offered. Second, the letter provides evidence that had Mr. Byrd been informed of the true nature of the charges against him and the terms of the plea, he would have accepted the offer.

Mr. Byrd has also provided affidavits from others stating that Mr. Washington misstated the prison time Mr. Byrd faced. Ms. Williams' affidavit corroborates Mr. Byrd's account of the circumstances surrounding the plea colloquy. Ms. Williams states that when she asked Mr. Washington about the mandatory minimum, he did not address her concerns. Ms. Williams, Lillie Garth, and the Reverend Tommie Lewis have all filed affidavits stating that Mr. Washington told them that Mr. Byrd faced a maximum of ten years in prison if convicted. Taken together, these documents provide evidence that Mr. Washington did not understand Mr. Byrd's situation, which lends credence to Mr. Byrd's contention that Mr. Washington gave him incorrect legal guidance. As the court has noted, the colloquy itself cannot neutralize this error so that this matter could be decided without an evidentiary hearing.

But the government argues that the record shows that the government would have withdrawn the plea offer because it was premised on Mr. Byrd's cooperation, and Mr. Byrd had no intention to cooperate with the government. The court is not persuaded that the record unequivocally reflects that Mr. Byrd's cooperation was a prerequisite for the plea. The

government's briefing and Mr. Washington's affidavit *claim* that the agreement was premised on Mr. Byrd's cooperation. But in a pre-trial conference the day before the trial, counsel for the government informed the court it was not expecting the cooperation of Mr. Byrd "whether he pleads or not." (Cr. Doc. 87 at 18). And the agreement itself makes no mention of Mr. Byrd's cooperation. Therefore, the court rejects the government's argument that the record establishes the plea agreement was conditioned on Mr. Byrd's cooperation and because Mr. Byrd would have refused to extend such cooperation regardless of Mr. Washington's counsel, he was not prejudiced from any deficient advice about the plea.

Further, the record indicates that the plea offer would have been accepted by the court. At sentencing, the court told Mr. Byrd he made "a stupid decision when [he] decided to go to trial in this case, instead of pleading guilty, when the evidence was so strong against [him]." (Cr. Doc. 92 at 9). The court was also dismayed at the length of the sentence the mandatory minimums required the court to impose, noting that seasoned, violent criminals "with extensive criminal histor[ies] . . . have gotten less than this first time offender." (Cr. Doc. 92 at 17). Had Mr. Byrd knowingly and voluntarily signed the plea agreement, the court would have accepted it.

A court should hold an evidentiary hearing when "such a hearing could enable an applicant to prove the petitioner's factual allegations, which, if true, would entitle the applicant to habeas relief." *Schriro v. Loandrigan*, 550 U.S. 465, 474 (2007). But the court does not have to hold a hearing if the record refutes the petitioner's contentions. *Id.* Given the record before the court, it will hold an evidentiary hearing on Mr. Byrd's claim that he is entitled to habeas relief. The hearing will focus on whether Mr. Washington provided Mr. Byrd with effective assistance of counsel concerning the government's plea agreement, and whether that deficient performance prejudiced Mr. Byrd.

The allegations made by Mr. Byrd, if proven, would establish a reasonable probability that but-for Mr. Washington's deficient performance, he would have accepted the offered plea. Whether Mr. Byrd was adequately informed of the contents of the plea deal—both the terms of imprisonment he faced and whether it required his cooperation—is a dispute of fact not resolved by the record. If those facts are proven to be as Mr. Byrd alleges, he would be entitled to habeas relief. Therefore, the court will hold an evidentiary hearing on this claim.

3.     *Failure to Subject Government's Case to Meaningful Adversarial Testing*

Mr. Byrd argues that he should not be required to show prejudice from Mr. Washington's deficient performance because he did not subject the prosecution's case to meaningful adversarial testing. Prejudice can be presumed where

> (1) there is a "complete denial of counsel" at a "critical stage" of the trial, (2) "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," or (3) under the "circumstances the likelihood that counsel could have performed as an effective adversary was so remote as to have made the trial inherently unfair.

*Castillo v. Florida, Sec'y of DOC*, 722 F.3d 1281, 1286 (11th Cir. 2013) (quoting *United States v. Cronic*, 466 U.S. 648, 659–61).

The "meaningful adversarial testing" exception to *Strickland* prejudice found in *Chronic* is narrow; the exception only applies where defense counsel has "*entirely* failed to function as the client's advocate" by opposing the government's case. *Florida v. Nixon*, 543 U.S. 175, 179 (2004) (emphasis added); *see also Castillo*, 722 F.3d at 1287 ("[T]he Supreme Court has repeatedly underscored the narrowness of *Cronic*'s second exception."). Counsel's failure "must be complete" throughout the "proceeding as a whole," as opposed to merely at "specific points." *Bell v. Cone*, 535 U.S. 685, 697 (2002).

Prejudice is presumed in such cases because counsel's failure "makes the adversary process itself presumptively unreliable." *Cronic*, 466 U.S. at 659. In determining whether to apply *Cronic* or *Stickland*, the "difference is not of degree but of kind"; *Cronic* violations are a separate category from *Strickland* violations. *Bell*, 535 U.S. at 697.

Mr. Byrd has not shown that Mr. Washington *entirely* failed to mount meaningful opposition to the government's case. Mr. Washington gave an opening statement (Cr. Doc. 82 at 154–57); cross-examined the clerk of the gas station that was robed (Cr. Doc. 83 at 211–13); cross-examined Mr. Holmes; (Cr. Doc. 83 at 310–34); objected to the government's request that Mr. Byrd stand next to Mr. Flowers for the jury to make a physical comparison (Cr. Doc. 83 at 375–77); cross examined Mr. Flowers (Cr. Doc. 83 at 408–421); cross examined Huntsville Police Officer Michael McJunkins (Cr. Doc. 83 at 445–46); recalled Mr. Flowers and Mr. Holmes to stand for the jury to compare their heights (Cr. Doc. 83 at 447; cross examined Huntsville Police Officer Matthew Edger (Cr. Doc. 83 at 470–72); called Investigator David Williams with the Huntsville Police Department (Cr. Doc. 83 at 507–14); and gave a closing statement. (Cr. Doc. 84 at 600–08). Although Mr. Byrd may question the effectiveness of Mr. Washington's tactics, the record will not support a finding that he failed throughout the trial to subject the government's case to meaningful testing.

Mr. Byrd argues that "[w]hile any single one of these failures might not amount to constitutionally ineffective assistance of counsel, but put together, the representation amounted to a total and complete lack of constitutionally adequate representation." (Doc. 15 at 22) (quoting the affidavit of Attorney Dawson in Ex. E, ¶ 41). But that is not the *Cronic* standard. Such reasoning would seem to suggest that conduct that would not meet the *Strickland* standard on its own can aggregate to meet the more stringent *Cronic* standard. Mr. Byrd has alleged deficient

performance of a different degree than perhaps most *Strickland* claims, but he has not made a

showing of deficient performance of a different *kind*, as *Cronic* requires.

Therefore, the court finds that Mr. Byrd's claim that Mr. Washington failed to subject the

government's case to meaningful adversarial testing lacks merit.

**B.** ***Johnson* Claim**

Mr. Byrd argues that his sentence is due to be corrected under *Johnson v. United States*,

135 S. Ct. 2551 (2015), and *Welch v. United States*, 136 S. Ct. 1257 (2016), because neither

carjacking nor robbery qualify as a "crime of violence" under the "force clause" of §

924(c)(3)(A). He thus argues that the residual clause of § 924(c)(3)(B), like the residual clause

invalidated by *Johnson* contained in § 924(e), is void-for-vagueness.

Section § 924(c)(3) prohibits using or carrying a firearm during a crime of violence.

Under § 924(c)(3), a "crime of violence" is defined as a felony offense that

> (A) has as an element the use, attempted use, or threatened use of
> physical force against the person or property of another, or
> (B) that by its nature, involves a substantial risk that physical force
> against the person or property of another may be used in the course
> of committing the offense.

18 U.S.C. § 924(c)(3).

The first provision in Subsection A is often called the "force clause," while Subsection B

is the "residual clause." In *Johnson*, the Supreme Court held that a similar, but not identical,

residual clause contained in § 924(e) was unconstitutionally vague.

Whether the residual clause of § 924(c) survived *Johnson* is an open question in the

Eleventh Circuit. *See In re Smith*, 829 F.3d 1276, 1279 (11th Cir. 2016) (noting that in

determining whether to grant requests for successive § 2255 petitions, the Court has "assumed"

that § 924(c)'s residual clause could be invalid but that conclusion is "not self-evident and . . .

there are good reasons to question an argument that *Johnson* mandates the invalidation of § 924(c)'s particular residual clause."). However, because carjacking and robbery meet the force clause, this court need not consider whether the residual clause of § 924(c) is unconstitutionally vague.

The Eleventh Circuit has held the federal crime of carjacking meets the force clause of § 924(c). *In re Smith*, 829 F.3d at 1280–81 ("In short, our precedent holds that carjacking . . . satisfies § 924(c)'s force clause, and that ends the discussion."). So Mr. Byrd's crime of carjacking qualifies as a "crime of violence" under § 924(c)'s force clause.

Mr. Byrd also challenges whether robbery, the predicate offense of Mr. Byrd's other § 924(c) charge, is a crime of violence. Because the federal indictment did not charge Mr. Byrd with the state law crime of robbery, the court considers its instruction to the jury regarding what conduct constitutes "robbery" to determine whether it qualifies as a crime of violence under § 924(c)'s use of force clause.

 The court instructed the jury that "[t]he term 'robbery' means the unlawful taking or attaining of personal property from the person or in the presence of another against the will by means of actual or threatened force or violence or fear of injury immediate or future to his person." (Cr. Doc. 84 at 561). Mr. Byrd argues that nothing in the court's instruction mentions "the use, attempted use, or threatened use of physical force against the person or property of another" so as to fall under § 924(c)(3)(A). But the court's instruction plainly mentions those elements. The court instructed the jury that to find that Mr. Byrd committed a robbery, it must find he used, or threatened to use, force, violence, or fear of injury to obtain another's property. Thus robbery as defined by the court qualifies as a crime of violence.

Further, the court's jury instruction is substantially similar to the elements of Hobbs Act

robbery (wrongfully obtaining property by "means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property"), which the Eleventh Circuit has held qualifies as a crime of violence under § 924(c)(3)(A). *See* 18 U.S.C. § 1951(B)(1); *In re Fleur*, 824 F.3d 1337, 1341 (11th Cir. 2016) ("[R]obbery offense meets the use-of-force clause of the definition of a crime of violence under § 924(c)(3)(A)."). Accordingly, the crime of robbery, as defined by the court's instruction to the jury, constitutes a crime of violence under § 924(c)(3)(A).

Because both the carjacking and robbery offenses of which the jury convicted Mr. Byrd meet the force clause of § 924(c), Mr. Byrd's sentence is valid even if the Supreme Court's decision in *Johnson* rendered the residual clause of § 924(c) invalid. Therefore, Mr. Byrd's *Johnson* claims lacks merit.

## III. CONCLUSION

The court finds that Mr. Byrd's claims for habeas relief based upon ineffective assistance of counsel because of a conflict of interest and failure to subject the prosecution's case to meaningful adversarial testing lack merit. The court finds that Mr. Byrd's claim for habeas relief because of *Johnson* also lacks merit.

Because disputes of fact and credibility exist as to whether Mr. Byrd is entitled to relief for his ineffective assistance of counsel claim concerning plea negotiations, the court will hold an evidentiary hearing to further develop the record. The court will enter an order consistent with this opinion and set the hearing by separate order.

**DONE** this the 26th day of June, 2017.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE