IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| CAMERON RASHUN BYRD, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Case No. 5:13-cv-08054-KOB |
| ) | 5:11-cr-404-KOB-PWG |
| ) | |
| UNITED STATES OF AMERICA ) | |
| ) | |
| Respondent. ) | |

**MEMORANDUM OPINION**

On July 31, 2017, the court held an evidentiary hearing to expand the record on Petitioner Cameron Byrd's claim that his trial counsel, Frederic Washington, provided him ineffective assistance during plea negotiations with the government. Because the record reflects that Mr. Byrd received ineffective counsel that prejudiced him, the court will grant Mr. Byrd's petition.

**I.      FINDINGS OF FACT**

The court has previously laid out the procedural history of Mr. Byrd's crimes and prosecution. *See* (Doc. 27 at 1–9). Two disputed questions remained. First, what advice did Mr. Washington give Mr. Byrd about the government's proposed plea agreement? Second, if that advice was insufficient, would Mr. Byrd have accepted the government's plea agreement but-for Mr. Washington's ineffective assistance?[1]

Before setting out the particular factual findings, the court notes that this case, like many

---

[1] The prejudice inquiry also asks whether the court would have accepted the plea agreement. One thing I know without a doubt is this court would have the accepted the proposed plea agreement that would have removed a mandatory minimum 25-year consecutive sentence for a first-time offender who was less culpable than his co-defendant who received a lesser sentence.

1

collateral challenges involving advice given during criminal cases, ultimately comes down to a credibility contest between the attorney and the petitioner. This case turns on whether a preponderance of the evidence supports Mr. Washington's or Mr. Byrd's narrative of events. Other witnesses may bolster or undermine one of the accounts. But the critical question is what Mr. Washington told Mr. Byrd about the proposed plea agreement and whether Mr. Byrd would have accepted it if he had been given adequate counsel. The best evidence to answer those questions comes from Mr. Byrd's and Mr. Washington's own testimony.

The court has reservations about the credibility of Mr. Washington's testimony, which was unaided by any file on the case. Mr. Washington testified at the hearing that he does not currently possess a file for Mr. Byrd's case, though one existed at some point. Mr. Washington's testimony at the hearing was based entirely on his memory of events over five years ago. From merely the undisputed facts in the record, serious questions arise about his representation of Mr. Byrd during this matter. While these facts do not by themselves support habeas relief, they bear on Mr. Washington's credibility.

Mr. Washington undertook the representation of Mr. Byrd in violation of his terms of employment with the Legal Aid Society. Legal Aid's employment manual prohibits the private practice of law. At the hearing, however, Mr. Washington testified that separate private practice is "not encouraged." Mr. Washington's representation of Mr. Byrd was impermissible, and yet Mr. Washington downplayed that fact at the hearing, seeming to insist that, merely because no one (except the employment manual) had explicitly told him he could not engage in the private practice of law, he was permitted—or at least only innocently mistaken—in doing so. Such

testimony calls into question Mr. Washington's professional judgment, if not his credibility.[2]

Casting further doubt on Mr. Washington's judgment is his testimony that he told Mr. Byrd that he had a "50-50 shot at trial" because that was what he told all his clients about their chances at trial. Such routine practice ignored that in this case the government's strong case against Mr. Byrd included video evidence and testimony of two cooperating witnesses. By Mr. Washington's own testimony, he failed to offer Mr. Byrd an individualized assessment of his case.

Mr. Washington also failed to follow through on commitments made to the court. At the pretrial conference held a week before trial, Mr. Washington told the court that he was hoping to meet Mr. Byrd that afternoon to communicate a plea offer made by the government. The court asked Mr. Washington to let it know as soon as possible if Mr. Byrd intended to accept the offer. Mr. Washington said he would do so and that he generally did not like for a plea to be accepted the day of trial. *See* (Cr. Doc 87 at 16–17). However, at the hearing, Mr. Washington testified that he did not meet with Mr. Byrd at all during the week between the conference and the trial. Mr. Washington only met with Mr. Byrd the morning of the trial. Mr. Washington offered no explanation for the delay in carrying out his commitment to promptly discuss the government's offer with his client.

Because of these troubling facts, the court accords little weight to Mr. Washington's testimony. Therefore, upon full consideration of the evidence, the court makes the following findings of material fact:

1. Before this matter, Mr. Byrd had no previous experience with the criminal justice system in general or the Federal Criminal Justice System in particular.

---

[2] Although Legal Aid terminated Mr. Washington's employment shortly after the trial of this case, Mr. Washington testified that he was terminated for "other reasons."

2. A CM-ECF search indicates Mr. Washington had never represented an individual with multiples charges under 18 U.S.C. § 924(c) in the United States District Court for the Northern District of Alabama.

3. On the day of his arraignment, Mr. Byrd and Mr. Washington met with the FBI Agent Jonathan Sumner and Assistant United States Attorney Terrence O'Rourke in a *Kastigar* meeting where Mr. Byrd indicated a willingness to cooperate.

4. Mr. Washington met with Mr. Byrd on two occasions between arraignment and trial while he was detained in the Cullman County Jail. These meetings occurred on November 25, 2011, and December 24, 2011. Each of the meetings lasted approximately 15–20 minutes.

5. Mr. Washington and Mr. Byrd discussed a plea agreement offered by the government at the December meeting.

6. Mr. Washington told Mr. Byrd that he faced a sentence of up to ten years if he proceeded to trial and was convicted.[3]

7. Mr. Washington told Mr. Byrd that he had a "50-50 shot" of prevailing at trial.

8. Mr. Washington also met with Mr. Byrd on the morning of the trial.

9. Mr. Washington did not explain to Mr. Byrd the purpose of the court's colloquy with him on the morning of trial about the rejected plea agreement. Instead, Mr. Byrd only answered "yes" to the court's questions because Mr. Washington had instructed him to do so.

10. Mr. Washington did not provide Mr. Byrd with a copy of the indictment, the proposed plea agreement, discovery related to his case, or the presentence investigative report.

11. The government offered a written plea agreement that was not contingent on Mr. Byrd's cooperation, and Mr. Washington failed to communicate to Mr. Byrd that the offer did not require his cooperation. Mr. Washington testified that Mr. Byrd rejected the plea agreement because he did not want to be a snitch.

12. Under the proposed agreement, the government would have dropped one of the 924(c) charges in exchange for Mr. Byrd pleading guilty to the other two counts; the dismissal of the second count would have removed the 25-year mandatory consecutive sentence.

---

[3] In addition to Mr. Byrd's testimony, Rev. Tommie Lewis's testimony, and Sonja Williams's testimony, Mr. Byrd's mother supports this finding.

13. Had Mr. Byrd been aware that the plea agreement did not require his cooperation, *or* that he was facing a mandatory 32-year sentence, he would have accepted the plea.

The finding concerning the terms of the plea agreement warrants explanation as to the court's reasoning. At the hearing, the government attempted to establish a "nuance" concerning what the plea agreement required of Mr. Byrd. Although the written plea agreement did not require Mr. Byrd's *cooperation*, the government said that if Mr. Byrd accepted the deal, it would *call him as a witness* in the trial against Ernest Starks, the remaining defendant, and that the government communicated that fact to Mr. Washington. Because Mr. Byrd's Fifth Amendment rights would no longer be implicated, the government argued he could be subpoenaed to give testimony.

However, the record does not support this nuance. At a phone conference a week before the trial, counsel for the co-defendant Mr. Starks expressed his concern that if Mr. Byrd accepted the plea agreement *and testified for the government*, he would need to ask to continue the trial. In direct response to this concern, the government attorney stated he did not "expect the cooperation of Mr. Byrd *whether he pleads or not*." (Cr. Doc. 87 at 18) (emphasis added). Both Mr. Starks' counsel and the court understood that Mr. Byrd would not be testifying under any circumstances, and so the trial could proceed the next week against Mr. Starks regardless of whether Mr. Byrd accepted a plea in the meantime. *See id*. at 18–19 ("My whole concern is premised on whether he does in fact testify . . . [i]f that is not an issue, wonderful.").

Had Mr. Byrd accepted the plea and the government called him to the stand, Mr. Starks' counsel would have protested with good cause. The court would not have permitted Mr. Byrd to testify because of the government's representation during the phone conference in direct

response to Starks' counsel.

The only logical inference of the government's statement at the conference is that an offer was on the table to drop one of the § 924(c) charges that did not require Mr. Byrd's cooperation and that Mr. Byrd would not testify. Taken with the written plea agreement's silence on this issue, the court can only conclude that the agreement was not premised on Mr. Byrd's cooperation or testimony.

In reaching this conclusion, the court does not find that Mr. Washington or the Assistant United States Attorney intentionally misled the court about the plea agreement. Neither attorney had access to a file to review before testifying about events that occurred in or before January 2012. The court had the advantage of the transcript from the pre-trial conference, as well as the proposed written plea agreement. Mr. Washington's affidavit provided to the court stated that the government's plea offer was conditioned on cooperation. *See* (Doc. 9-1 at 1). However, at the hearing, after reviewing the written plea agreement, Mr. Washington acknowledged the plea offer did *not* require cooperation after reviewing the document.

## II. THE LEGAL STANDARD

Counsel for a criminal defendant "has a duty to advise a defendant, who is considering a guilty plea, of the available options and possible sentencing consequences." *Etheridge v. United States*, 287 F. App'x 806, 808 (11th Cir. 2008). When a defendant rejects a plea offer, to establish prejudice, he must show (1) a reasonable probability that the plea offer would have been accepted but for counsel's deficient performance; (2) the plea would have been entered without the prosecution rescinding the offer or the court rejecting it; and (3) the plea would have resulted in a lesser charge or a lower sentence. *Missouri v. Frye*, 566 U.S. 133, 147 (2012); *see also Lafler v. Cooper*, 566 U.S. 156, 174 (2012).

Deficient performance exists when counsel acts "outside the wide range of professionally competent assistance." *Strickland v. Washington*, 466 U.S. 668, 690 (1984). The test is not what the best—*or even a good*—lawyer would have done, but "whether *some reasonable lawyer* at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc) (emphasis added).

## III. CONCLUSIONS OF LAW

The government does not dispute that if Mr. Byrd would have accepted the plea offer, he would have received a lesser sentence. Accordingly, the court will only consider whether Mr. Washington's performance was deficient and whether but-for that performance, Mr. Byrd would have accepted the plea agreement.

### A. Constitutional Violation

#### 1. *Deficient Performance*

The court finds that Mr. Washington's performance was constitutionally deficient. First, Mr. Washington failed to inform Mr. Byrd that the government had offered a plea agreement that did not require his cooperation or testimony. Mr. Washington had a duty to do so: "[C]ounsel has an obligation to consult with [his] client on important decisions and to keep him informed of significant developments in the course of his prosecution." *Diaz v. United States*, 930 F.2d 832, 834 (11th Cir. 1991). The offer of a plea agreement that would remove a 25-year mandatory consecutive sentence qualifies as a significant event.

Notably, Mr. Washington received a written plea agreement that did not contain any reference to cooperation and did not give that document to Mr. Byrd. And, Mr. Washington was at the conference where the government indicated it would not be calling Mr. Byrd as a witness, and Mr. Washington had said he was hoping to go *that day* to communicate the government's

7

offer to Mr. Byrd. But that meeting did not occur until the morning of trial; and Mr. Washington still informed Mr. Byrd the agreement was premised on his cooperation. By failing to inform Mr. Byrd of the material terms of the government's plea offer, Mr. Washington acted outside the range of competent counsel.

Second, Mr. Washington failed to accurately advise Mr. Byrd about the potential sentence he faced when rejecting the government's plea offer and proceeding to trial. This performance is constitutionally deficient. *See Etheridge v. United States*, 287 F. App'x 806, 808 (11th Cir. 2008) ("An attorney has a duty to advise a defendant, who is considering a guilty plea, of the available options and possible sentencing consequences.") (citing *Brady v. United States*, 397 U.S. 742, 756 (1970)); *see also United States v. Herrera*, 412 F.3d 577, 581 (5th Cir. 2005) ("[A]n attorney who underestimates his client's sentencing exposure by 27 months does not provide his client with the information needed to make an informed decision about accepting a plea offer or going to trial."). Mr. Washington misrepresented the sentence Mr. Byrd faced by at least 25 years. Given that error, Mr. Washington cannot be said to have provided Mr. Byrd sufficient advice about the plea offer.

### 2. Acceptance of the Plea

To be entitled to habeas relief, Mr. Byrd needs to show that he would have accepted the offer but-for Mr. Washington's deficient performance and that the government would not have withdrawn the offer. The court concludes Mr. Byrd has satisfied this burden.

The government argues that Mr. Byrd would not have accepted the proposed plea agreement because it would have required him to testify. However, the court has found as a matter of fact that the plea agreement contained no such requirement.

The government also argues that the colloquy on the morning of trial shows that Mr.

Byrd fully understood the possible sentence he faced when he rejected the plea offer. However, as the court discussed in its previous opinion, the colloquy did not conclusively establish that fact. Rather, Mr. Byrd's intent was still a question of fact to be resolved by the evidentiary hearing.

After surveying the record, the court has concluded that Mr. Byrd would have accepted the plea agreement had he been adequately informed by Mr. Washington about the offer's terms and the consecutive mandatory minimum sentences Mr. Byrd faced if convicted on all counts. This case was Mr. Byrd's first experience with the criminal justice system, and the court credits his testimony that he was merely responding during the colloquy as his lawyer directed him. Further, Mr. Washington never provided Mr. Byrd with the relevant materials to make an informed decision; Mr. Byrd did not have a copy of the indictment or the plea offer; so he was relying exclusively on Mr. Washington's counsel.

The court recognizes the position in which this places the government, and has no doubt that the reason it sought to have the colloquy placed on the record was to forestall precisely the challenge Mr. Byrd now brings. Indeed, the court shared the government's concern that this 19-year-old first-time defendant did not fully understand the consequences of the choice he made to reject the plea offer. But, for the court to make the finding the government seeks it to make concerning the sufficiency of the colloquy, the court would have had to conduct a more probing inquiry to satisfy itself that Mr. Byrd truly understood his position in rejecting the plea offer.

Doing so, however, would run afoul of the Eleventh Circuit's mandate that such judicial involvement in plea negotiations violates Federal Rule of Criminal Procedure 11(c)(1). *See United States v. McCray*, 280 Fed. Appx. 945, 947 (2008) ("We therefore conclude that the district court impermissibly participated in plea negotiations by repeatedly comparing the higher

sentence that McCray would likely receive if he went to trial with the sentence that he would otherwise receive if he pled guilty."). *McCray* is consistent with the Eleventh Circuit's jurisprudence stating that Rule 11 is designed to "entirely eliminate judicial pressure from the plea bargaining process." *United States v. Diaz*, 138 F.3d 1359, 1362 (11th Cir. 1998). Accordingly, a judge violates the rule if she "suggest[s] that the defendant might get a longer sentence if he goes to trial." *Chacon-Vela v. United States*, No. 1:07-CR-0148-JEC-2, 2012 WL 1657193, at *6 (N.D. Ga. May 9, 2012).

Notably, the Eleventh Circuit decided *McCray* before the Supreme Court's decisions in *Frye* and *Lafler* clarified that the right to assistance of counsel extends to plea negotiations. *See Missouri v. Frye*, 566 U.S. 133, 147 (2012); *Lafler v. Cooper*, 566 U.S. 156, 174 (2012). Given the dynamic those cases have introduced into these type of situations, perhaps the opportunity will arise for the Eleventh Circuit to provide guidance to district courts on how to conduct such colloquies in accordance with Rule 11 while still ensuring that they can serve their intended purpose of finality by insuring that a defendant fully understands the terms of the proffered plea agreement and the consequences of rejecting it.

The court has already stated that it would have accepted Mr. Byrd's plea had he accepted the government's offer. *See* (Doc. 27 at 17). Therefore, the court concludes that but-for Mr. Washington's deficient performance, Mr. Byrd would have pled guilty to two counts, the court would have accepted the plea, and Mr. Byrd would have received a substantially lesser sentence.

### B. Remedy

What now? In *Lafler*, the Supreme Court clarified the remedy for ineffective assistance of counsel during plea negotiations:

> The correct remedy in these circumstances, however, is to order

> the [government] to reoffer the plea agreement. Presuming respondent accepts the offer, the [court] can then exercise its discretion in determining whether to vacate the convictions and resentence respondent pursuant to the plea agreement, to vacate only some of the convictions and resentence respondent accordingly, or to leave the convictions and sentence from trial undisturbed.

*Lafler*, 566 U.S. at 174.

The court will order the government to reoffer the written plea agreement made to Mr. Byrd and contained in the record. If Mr. Byrd accepts the offer, the court will vacate his second § 924(c) conviction and resentence him accordingly.

## IV. CONCLUSION

Because the court finds that Mr. Byrd received ineffective assistance of counsel concerning the offered plea agreement that materially prejudiced him, the court will grant his petition for habeas relief. The court will enter a separate order consistent with this opinion instructing the government to reoffer the plea agreement to Mr. Byrd.

**DONE** and **ORDERED** this 22nd day of August, 2017.

_____
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE